J-A28041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 652 MDA 2021 |

Appeal from the Order Dated May 12, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee No. 63 Year of 2019

| | | |
|---|---|---|
| IN RE: K.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 653 MDA 2021 |

Appeal from the Order Dated May 12, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee No. 64 Year of 2019

| | | |
|---|---|---|
| IN RE: K.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 654 MDA 2021 |

Appeal from the Order Dated May 12, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee No. 65 Year of 2019

J-A28041-21

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED: JANUARY 28, 2022**

Appellant, K.M. ("Mother"), files these consolidated appeals[1] from the orders of May 12, 2021,[2] in the Northumberland County Court of Common Pleas, granting the petition of Northumberland County Children & Youth Services ("CYS" or the "Agency") to terminate involuntarily Mother's parental rights to her minor, dependent daughters, K.K., born in March 2011, K.R., born in December 2014, and K.M., born in October 2018 (collectively, the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We observe that the trial court issued separate opinions as to each appeal. However, given the interrelated factual and procedural background, as well as the interrelated issues raised, we address these appeals together in one memorandum.

[2] While the dockets likewise reflect a recorded date of May 12, 2021, there is no notation on the dockets that notice was given and that the orders were entered for purposes of Pa.O.C.R. 4.6(b) (stating, "The clerk shall note in the docket the date when notice was given to the party or to his or her counsel under subparagraph (a) of this Rule."). **See** Note Pa.O.C.R. 4.6 (noting that the Rule is "derived from Pa.R.C.P. No. 236."); **see also Frazier v. City of Philadelphia**, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the decree has been given as required by Pa.R.Civ.P. 236(b)".).  Thus, the orders were not entered and the appeal period not triggered.  Although we consider the matters on the merits, we caution the Court of Common Pleas of Northumberland County as to compliance with the rules with regard to the entry of orders.

- 2 -

"Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3, 4] After review, we affirm.

Relevant to these matters, as a result of concerns of substance abuse, supervision, truancy, home conditions, and general parenting, K.K. and K.R. were adjudicated dependent in July 2018, but remained in the home with Mother. Notes of Testimony ("N.T."), 10/20 & 21/20, at 74, 86.[5] Subsequent to further referral related to substance abuse, the Agency placed K.K. and K.R. on September 19, 2018. *Id.* at 87. Thereafter, the Agency placed K.M. the following month, on October 16, 2018, upon discharge from the hospital due to positive illegal substance testing at birth. *Id.* at 84, 87-88. K.K. and K.M. were placed with K.K.'s paternal grandparents.[6] *Id.* at 142-43. K.R. was placed with her paternal grandfather. *Id.* at 133, 139. Notably, the Children remained placed in these kinship resource homes.

---

[3] We observe that, while the Agency petitioned to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b), the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

[4] The parental rights of the Children's respective fathers were additionally terminated by separate orders and decrees of the same date. No father filed a separate appeal or is a participating party in the instant appeals.

[5] The notes of testimony for these hearing dates are contained in a singular, continuously paginated volume.

[6] In July 2020, Mother gave birth to a fourth child, who was also placed with K.K. and K.M. *Id.* at 114. This fourth child was not a subject of the hearings in question and is not a subject of these appeals.

As recounted by the court, "At the adjudication hearings, []Mother was ordered to enroll herself in Parenting Class, submit to drug screening, ensure the school-aged children attend school, enroll [K.R.] in Head Start, maintain safe and stable housing, maintain or obtain employment or financial security for the family, enroll in counseling to address her substance abuse issues." Trial Court Opinion ("T.C.O.") (K.K.), 6/30/21, at 2 (unpaginated).[7]

Thereafter, the Agency filed petitions for the termination of parental rights on December 17, 2019. After several continuances, the court eventually conducted hearings on October 20 and 21, 2020. Mother was present and represented by counsel. While none of the Children's fathers were present, all were represented by counsel. Further, the Children were represented by a guardian *ad litem* as well as legal counsel.[8] The Agency presented the testimony of Allison Jacoby, SWAN LSI paralegal; Michael Gillum, M.A., licensed clinical psychologist, who prepared a bonding evaluation[9] and testified as an expert in psychology per stipulation of the parties; Lexus Turrisi, former intake caseworker, the Agency; Diana Stine, casework supervisor, the Agency; Dana Fuller, family resource worker, the

---

[7] While the court issued separate opinions for each child, they are substantially similar. As such, reference to and citation to the trial court opinion is to the opinion for K.K.

[8] The Children were represented by guardian *ad litem*, Cindy Kerstetter, Esquire, and legal counsel, Brian Ulmer, Esquire. Each submitted briefs to this Court in support of termination of Mother's parental rights.

[9] Mr. Gillum's report was marked and admitted as Agency Exhibit A.

Agency; Melissa Eisenhour, permanency caseworker, the Agency; R.Z., K.K.'s paternal grandfather, and K.K.'s and K.M.'s resource parent; and Roger Hilbert, CYN Treatment Court. The parties stipulated as to the testimony of K.R.'s paternal grandfather and resource parent, J.R. Additionally, the guardian *ad litem* again presented the testimony of Melissa Eisenhour. Further, K.K. testified without Mother present.[10] Lastly, Mother testified on her own behalf.[11, 12]

By orders of May 12, 2021, the court granted the Agency's petitions to terminate involuntarily Mother's parental rights as to each of the children. Further, by decrees also dated May 12, 2021, the court terminated Mother's

---

[10] Aside from Mother, who was present in the courtroom, the witnesses presented testified virtually via Zoom. Presumably, this was due to the COVID-19 pandemic.

[11] While incorporated during the termination hearing, N.T., 10/20 & 21/20, at 79-80, the dependency records for the Children were not included as part of the certified records forwarded to this Court. On August 31, 2021, the Agency filed an application requesting this Court enter an Order directing that the dockets from the dependency court be forwarded to complete the record. Pursuant to order of September 9, 2021, the application was denied without prejudice to refile the application with a pinpoint citation as to where the trial court incorporated the related lower court dependency dockets. Per Curiam Order, 9/9/21. The Agency failed to refile their application including the citation details. Nonetheless, we do not find this fatal to our disposition of the instant appeals.

[12] Pursuant to order of October 21, 2020, the court provided for the parties to submit a brief as closing argument by November 13, 2020. Mother filed a brief on November 13, 2020. The court further scheduled a telephone conference for October 28, 2020 as to visitation involving K.K. and K.M. Further information surrounding this conference is not contained in the record.

parental rights.[13]  Thereafter, on May 20, 2021, Mother, through appointed counsel, filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), as to the court's orders.  Mother filed amended notices of appeal and concise statements of errors complained of on appeal on June 15, 2021.  Mother appeals from the court's orders and not the decrees.  This Court consolidated Mother's appeals *sua sponte* on June 23, 2021.

On appeal, as to K.K., Mother raises the following issues for our review:

1. Whether the [c]ourt abused its discretion by terminating Appellant's parental rights preventing her from seeing her child when natural father is still involved despite the continued refusal to cooperate or participate with [the Agency] and their recommendations?

2. Whether the [c]ourt erred by terminating Appellant's parental rights when [the Agency] did not offer appropriate resources to Appellant in an effort to follow through with their recommendations?

3. Whether the [c]ourt erred by terminating Appellant's parental rights when the Coronavirus pandemic caused a challenge for Appellant and child to appropriately bond when visits were only occurring via social media platforms (i.e. Zoom)?

4. Whether the [c]ourt abused its discretion by terminating Appellant's parental rights when the resource parents of child verbally discouraged child from having a relationship with Appellant?

5. Whether the [c]ourt abused its discretion by terminating Appellant's parental rights when the resource parents prevented Appellant from spending meaningful time with her child?

---

[13] In addressing the length of time between the termination hearing and the issuance of the court's decision, the court acknowledged that it afforded Mother additional time.  T.C.O. at 3-4 (unpaginated).

Mother's Brief (K.K.) at 7-8 (suggested answers omitted).[14]

As to K.M., Mother raises the following issues for our review:

6. Whether the [c]ourt erred by terminating Appellant's parental rights without the confirmation of the paternity of child's biological father?[15]

7. Whether the [c]ourt erred by terminating Appellant's parental rights when [the Agency] did not offer appropriate resources to Appellant in an effort to follow through with their recommendations?

8. Whether the [c]ourt erred by terminating Appellant's parental rights when the Coronavirus pandemic caused a challenge for Appellant and child to appropriately bond when visits were only occurring via social media platforms (i.e. Zoom)?

9. Whether the [c]ourt abused its discretion by terminating Appellant's parental rights when the resource parents prevented Appellant from spending meaningful time with her child?

Mother's Brief (K.M.) at 38-39 (suggested answers omitted).

Lastly, as to K.R., Mother raises the following issues for our review:

10. Whether the [c]ourt abused its discretion by terminating Appellant's parental rights preventing her from seeing her child when natural father is still involved despite the continued refusal to cooperate or participate with [the Agency] and their recommendations?

11. Whether the [c]ourt erred by terminating Appellant's parental rights when [the Agency] did not offer appropriate resources to Appellant in an effort to follow through with their recommendations?

---

[14] While Mother's brief consists of separate briefs at to each child, we note the continuous pagination.

[15] Mother concedes this issue is waived.  Mother's Brief (K.M.) at 44.

12. Whether the [c]ourt erred by terminating Appellant's parental rights when the Coronavirus pandemic caused a challenge for Appellant and child to appropriately bond when visits were only occurring via social media platforms (i.e. Zoom)?

Mother's Brief (K.R.) at 65 (suggested answers omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004).

Here, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (internal citation omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (quoting *In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011)). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, *supra* at 1105 (quoting *In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Instantly, in finding grounds for termination of Mother's parental rights, the trial court reasoned:

> It is evident to this [c]ourt that Mother (and the biological [f]athers) are unable and unwilling to provide loving, caring, nurturing parenting to these children. Mother's struggle with her substance addiction continues to plague her life. Mother has struggled to both admit she needs the help and consistently seek it out. Typical red-flags in a person's recovery are present here. Mother maintains a relationship with a paramour who actively uses. Mother is not credible in her rendition of day-to-day occurrences. She alternates between admitting she has a problem and identifying as "not having" a substance use disorder.

    While the [c]ourt is sympathetic to a [m]other who obviously loves her children, it cannot be denied that Mother failed to provide for the [C]hildren in the roughly two years this case has been active. In addition to Mother's failure to remedy the circumstances which led to placement, she has also demonstrated a settled purpose of relinquishment. Mother essentially disappeared from March of 2020 until August of 2020. During this time, she had no contact with the Agency, her attorney, nor her children. This evidences a settled purpose of relinquishment on the part of Mother.

T.C.O. at 6 (unpaginated).

Mother, however, argues that she made efforts at reunification and remedying the causes of the Children's placement. She references her visitation, her completion of parenting classes, her attempts at drug and alcohol treatment, and her attempts to repair and clean her house. Mother's Brief (K.K.) at 17-20. Mother maintains:

    Therefore, it is clear that Mother had been attempting to comply with the Agency in order to alleviate the conditions and causes of the placement of her child. The conditions and causes of the placement can be, and were being addresse[d], contrary to the requirements under Section 2511(a)(2), as Mother actively sought out drug and alcohol counseling at different places in an attempt to locate a facility she could afford, she worked towards becoming sober, she progressively worked on fixing the concerns with her house, she became employed, she attended majority of her visits with her children, she retained a good relationship with one [r]esource [p]arent, and she successfully completed her parenting classes.

*Id.* at 20-21.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). Significantly, Melissa Eisenhour, Agency permanency caseworker, testified that the conditions that led to

placement still existed at the time of the termination hearing, approximately two years after placement. N.T., 10/20 & 21/20, at 119. Ms. Eisenhour further confirmed that Mother's progress and compliance were previously deemed "minimal" and would still be classified as such at that time. *Id.* at 122. She noted that Mother was not cooperative and had not completed all required services for reunification. *Id.* at 268. Ms. Eisenhour stated:

Q. [Mother] testified under oath that she has been cooperative with the agency as of late, and has completed all of her services, and that there is nothing else that she could have done in order to reunify with her children. Would you agree with that?

A. I would not.

Q. And[,] in particular, why would you disagree with that?

A. Because as of the last time I drug tested her, which was September 25th, she was still using illegal substances.[16] She is still refusing to sign child permanency plans. Prior to [Mother's youngest child's birth] I hadn't heard from her in months despite numerous attempts; knocking on her door, calling her, texting her, leaving her notes, writing her letters.

Q. Was or is her house in shape for those children to move back in?

A. They couldn't come home today. There is no heat in the home. And the roof is -- looks like it is ready to fall in, to me. I also asked her during the family group to have the code inspector willingly come to her home to make sure it was safe, and she refused.

*Id.* Similarly, Mr. Gillum noted Mother's lack of commitment as well as personality traits that are "resistant to change." *Id.* at 34-37; *see also*

_____

[16] We observe that, at the time of the hearing, after three prior intake appointments at three different facilities beginning in December 2019, Mother had been engaged in an intensive outpatient drug and alcohol treatment program since September 16, 2020, a month prior. *Id.* at 117-18.

- 13 -

Agency Exhibit A at 10-11 ("She has not demonstrated commitment for two years nor has she sought assistance to achieve the goals necessary to reunify.").

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.* We are mindful of our standard of review set forth above, and reiterated in *S.P.*, and, most recently, in *In re S.K.L.R.*, ___ Pa.___, 256 A.3d 1108, 1127, 1129 (2021), that we must not substitute our judgment for that of the trial court. As we discern no abuse of discretion, we do not disturb the trial court's findings.

To the extent that Mother's argument includes an assertion of a lack of reasonable efforts on the part of the Agency, this is waived for failure to discuss this in the argument section of her brief. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).

Regardless, even if not waived, such a challenge is without merit. When reviewing a termination decree on appeal, courts are not required to consider reasonable efforts provided to a parent. *See In the Interest of: D.C.D.*, 629 Pa. 325, 342-343, 105 A.3d 662, 672 (2014) (concluding, "Neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." Although the Court recognized "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child[,]" it held that the provision of reasonable efforts is not a requirement for termination.).

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer

that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In determining that termination of Mother's parental rights favors the Children's needs and welfare under Section 2511(b), or best interests, the trial court stated:

The discussion relative to the best interests of the [C]hildren is more sorrowful by far. As the psychologist testified, [K.K.] (in particular) maintains some hope that Mother will turn herself around. But [K.K.] testified in the hearing and was adamant she wanted no contact with Mother. It was evident to the [c]ourt the hurt, indeed the anguish, [K.K.] must be feeling to be confronted

with a [m]other during visits that she no doubt loves very much but cannot reside with. It is this kind of emotional trauma that motivates [c]ourts to not force children to wait for permanency.

Despite the obvious love and compassion that Mother has for these children, their need for developmentally appropriate parenting outweighs her need for her children. Since clear and convincing grounds for termination are present, the [c]ourt's focus shifts to whether termination is in the best interests of the [C]hildren. In this case, it is.

T.C.O. at 6-7 (unpaginated).

As to Section 2511(b), upon review, we likewise discern no abuse of discretion. At the time of the hearing the Children had been placed for approximately two years. N.T., 10/20 & 21/20, at 84, 87-88, 142-43. During this time, Mother's visitation never progressed beyond supervised visitation. *Id.* at 122-23. Further, Mother went for an extended period of time in the spring/summer of 2020 without visitation.[17] *Id.* at 114, 117. As a result, psychologist, Michael Gillum, who conducted a bonding assessment, found that Mother had a "very minimal" bond with K.K. *Id.* at 25; *see also* Agency Exhibit A at 10. Mr. Gillum stated, "So I think [K.K.] is an angry child. And she has the right to be. But I believe that she probably wants contact with

_____

[17] Ms. Eisenhour recounted a lack of scheduled visitation from mid-March 2020 to the beginning of August 2020 while Mother was pregnant. N.T., 10/20 & 21/20, at 114. Although Ms. Eisenhour indicated that Mother maintained telephone contact with K.K. during this period, she reported a lack of contact with the Agency as well as K.R.'s resource parent during this time. *Id.* at 114, 117. Notably, K.R.'s resource parent still allowed additional in-person visitation, despite COVID-19, but Mother ceased visitation and contact after Easter 2020 until July 2020. *Id.* at 117. We additionally recognize that K.K.'s and K.M.'s resource father noted other instances where there were missed visits or telephone calls. *Id.* at 148.

her mother. However, overall, I determined that there is a very minimal bond between [K.K.] and [Mother]." *Id.* at 25. He reported "no bond" between Mother and K.M. *Id.* at 33-34; *see also* Agency Exhibit A at 10. ". . .I would say taking all the information into account, including the testing and the history, there is just not much of a bond." *Id.* at 34. Lastly, he found Mother's bond with K.R. "approached the normal range" or was "just in the normal range." *Id.* at 27-29, 32; *see also* Agency Exhibit A at 10. Mr. Gillum indicated that, given Mother's lack of commitment for an extended period of time with respect to her substance abuse issues, it was unlikely that Mother would be able to improve her bond with the Children. *Id.* at 34-37 (". . . [M]y prognosis for the future is that in terms of possibly improving her bonding, or improving her relationships with her four daughters, I'm afraid I would say it is guarded. There is not much of a chance with improving because she hasn't demonstrated any commitment for the past two years under really high motivational circumstances. So I don't think -- I think it is unlikely that she and the [C]hildren can enhance their relationship unless, as I said to the [c]ourt, unless she unexpectedly does decide to[] quit using illegal drugs, does get treatment and can maintain it."). He further opined that, while K.K. and K.R. would experience initial short-term symptoms as a result of severing any relationship with Mother, they would nonetheless be resilient and recover. *Id.* at 40-42. As to K.R., Mr. Gillum stated:

> . . .And I would say in [K.R.]'s case, she would certainly experience at least short[-]term emotional -- at least mild to moderate, maybe some emotional trauma if that bond was

completely separated.  I believe [K.R.] would recover from that.  It wouldn't necessarily be long[-]term psychological damage or emotional damage. . . .

However, at her age, normally children do recover. . . .

*Id.* at 40.  Likewise, as to K.K., he stated:

I believe with [K.K.] there would be initially some impact.  I believe that -- as I diagnosed her already, I think she already demonstrates anxiety and depression around abandonment issues regarding her mother.  She is also very upset about that issue.  So I believe that she would continue to be upset if there was a termination of parental rights and no contact.

However, I believe [K.K.] would be resilient and bounce back with pretty minimal symptoms within a couple of months.  I think that she hasn't had much contact with her mother in -- her mother is not really interacting with her in an appropriate way, or not enough.  So yes, I think [K.K.] would be essentially fine in the short term and the long term.  Although initially she would have some symptoms. . . .

*Id.* at 42.

Moreover, K.K. and K.M. are placed with K.K.'s paternal grandparents.  At the time of the hearing, they were placed for approximately two years and doing well.  N.T., 10/20 & 21/20, at 143-44.  As testified by K.K.'s paternal grandfather, R.D.Z., K.K. and K.M. "are doing extremely well here.  They seem to like it, that's for sure."  *Id.*  Similarly, K.R. is placed in her paternal grandfather's home where she is "doing well in his home and flourishing."  *Id.* at 133.

Also significant, K.K. testified that she does not want to return to her Mother and would like to remain with her paternal grandparents.  *Id.* at 160.  Discussing when she lived with her Mother, K.K. recounted a lack of food, lack of heat, poor home conditions, and truancy.  *Id.* at 160-61.  K.K. further

reported not only that Mother would lock her outside, but that she felt unsafe living with Mother as Mother would hurt her. *Id.* at 166-67.

Hence, the record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. The Children are entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

To the extent that Mother includes challenges to subsection (b) related to the fact that K.K.'s and K.R.'s fathers will still get to see them, that her bond with the Children was affected by the COVID-19 pandemic, and that K.K.'s and K.M.'s resource parents discouraged and prevented a relationship between she and the Children, such challenges do not convince us that the trial court abused its discretion.

Mother contends that the court abused its discretion in terminating her parental rights as K.K.'s and K.R.'s fathers will still be afforded the ability to have regular contact with them, an opportunity which will not be extended to her. Mother's Brief (K.K.) at 14-16. Mother highlights that K.K.'s and K.R.'s fathers made no efforts whatsoever towards reunification and cooperating with the Agency, in contrast to her efforts. *Id.* at 15-16.

As to the COVID-19 pandemic, Mother argues that K.K.'s and K.M.'s resource parents did not allow in-person visitation during the pandemic and that contact via telephone and social media is insufficient to establish a bond and for reunification. *Id.* at 23-24.

Mother further asserts that K.K.'s and K.M.'s resource parents discouraged and prevented a relationship between herself and her children.[18] *Id.* at 24-25. Mother points to the fact that she had a strained relationship with the resource parents and that the resource father expressed his opinion that her parental rights should be terminated. *Id.* She contends that the resource parents prevented communication and additional visitation. *Id.* at 25-27.

As the record corroborates the trial court's determinations, we find no abuse of discretion. Critically, any argument as to continuing contact post

---

[18] To the extent that Mother presents the discouragement of a relationship with Mother and prevention of spending meaningful time as separate issues and/or arguments, given that these are closely interconnected, we address them together.

termination is irrelevant to the consideration of whether terminating Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of K.K. and K.R. *See In re K.H.B.*, 107 A.3d 175, 184 (Pa.Super. 2014). Rather, of consequence, is an analysis of Mother's bond with the Children and their relationship with their resource parents, as reflected above.

Further, here, the termination petitions were filed in December 2019, several months prior to concerns and restrictions commencing in the United States related to the COVID-19 pandemic. Moreover, Mother ceased scheduled visitation from mid-March to August 2020, which coincided with her pregnancy. *Id.* at 114, 117. Although K.R.'s resource parent still allowed additional in-person visitation, despite the COVID-19 pandemic, Mother ceased visitation and contact after Easter 2020 until July 2020. *Id.* at 117. While the court gave credence to assertions of alienation, T.C.O. at 6 n.4 (unpaginated), the evidence supports the determination as to the Children's needs and welfare, and we do not disturb it.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/2022